Beatrice J. FEINS, Plaintiff–Appellant,

v.

AMERICAN STOCK EXCHANGE, INC., Defendant–Appellee.

No. 351, Docket 95–7304.

United States Court of Appeals, Second Circuit.

Argued Oct. 26, 1995.

Submitted April 17, 1996.

Decided April 24, 1996.

**1216**

Allen H. Carlin, New York City, for Plaintiff–Appellant.

Warren H. Colodner, New York City (Kirkpatrick & Lockhart LLP, David Simon, Eleanor A. Acer, of counsel), for Defendant–Appellee.

Paul Gonson, Solicitor, Jacob H. Stillman, Associate General Counsel, Katharine Gresham, Assistant General Counsel, Allan A. Capute, Special Counsel to the Solicitor, Securities and Exchange Commission, Washington, DC, for Securities and Exchange Commission, Amicus Curiae.

Before: FEINBERG, OAKES and CABRANES, Circuit Judges.

FEINBERG, Circuit Judge:

Plaintiff Beatrice Feins appeals from a judgment of the United States District Court for the Southern District of New York, John F. Keenan, J., dismissing her complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief can be granted. Feins sought compensatory and punitive damages resulting from the denial by defendant American Stock Exchange, Inc. (AMEX) of Feins's application for membership, where AMEX's denial was later set aside by the Securities and Exchange Commission (SEC) and in the interim the price of membership increased substantially. The question whether Feins has a private right of action under the securities laws for·damages against AMEX for allegedly improperly denying her membership application is a case of first impression in this circuit. For the reasons set out below, we affirm.

## I. Background

The principal facts underlying this case are apparently undisputed. AMEX memberships may be transferred directly between private parties. However, AMEX must approve the transaction and treats a transferee of an existing membership as an applicant for new membership. In January 1992, Feins filed an application to become a regular member of AMEX in conjunction with a proposed transaction whereby Feins would purchase for $83,500 the AMEX membership then owned by her grandson Jonathan Feins. The purchase price was slightly above the market price. At the time of the application, Feins was 82 years old and Jonathan Feins was 31. Neither was an active trader, and under the terms of the transaction, Feins proposed to continue her grandson's practice of leasing the membership to a third party, as allowed by the AMEX constitution. At the time, a regular AMEX member was entitled to select a beneficiary who would receive, within one year of the member's death, a one-time payment of $100,000 from the AMEX Gratuity Fund. This payment was funded by required pro-rata contributions from all other regular members.

In February 1992, the AMEX Membership Services Department denied Feins's application, stating that in view of Feins's age, the transaction was not appropriate because of the impact that it might have on the Gratuity Fund. This decision was affirmed in April

1992 by an AMEX hearing panel (the hearing panel), which found that "the proposed transaction appeared to have as its primary purpose an abuse of the Gratuity Fund." In November 1992, the Executive Committee of the Board of Governors of AMEX affirmed the decision of the hearing panel. After the decision of the hearing panel, Jonathan Feins transferred his membership to his father, Martin Feins, and AMEX approved.

Pursuant to § 19(d) of the Securities Exchange Act of 1934, as amended (Exchange Act), 15 U.S.C. § 78s(d), Feins sought review by the SEC of AMEX's decision to deny her membership application. In the appeal to the SEC, Feins sought reversal of AMEX's decision and admission to membership in AMEX on the same terms as the original transaction. In December 1993, the SEC in a written opinion set aside AMEX's decision because it could not conclude that AMEX acted in a manner consistent with its own rules in rejecting Feins's application. See In re Beatrice J. Feins and Jonathan E. Feins, 51 S.E.C. 918, 921 (1993).

As a threshold matter, the SEC determined that it was appropriate to resolve Feins's appeal even though she was not at that time an applicant for membership, i.e., she was not a proposed transferee of an existing membership because Jonathan Feins, as just indicated, had already transferred his membership to his father. *Id.* at 920. The SEC found that Feins met all of the membership criteria published by AMEX. *Id.* at 921. The SEC also stated that the factors used by AMEX to deny Feins's membership application—her age, the intrafamily nature of the transaction and the terms of the transfer—were "not identified in AMEX's rules" and had not been uniformly applied by AMEX in the past. *Id.* at 921–22. With respect to Feins's claim to be admitted as a member of AMEX on the transaction's original terms, the SEC construed this as a request for monetary damages, apparently because the market price of an AMEX membership had increased. The SEC then stated that it was not authorized to grant such relief. *Id.* at 922 n. 14.

After the SEC issued its order setting aside the AMEX decision, AMEX offered to admit Feins to membership. This offer presumably means that AMEX would not object to a proposed sale of a membership to Feins. Feins has not sought to purchase another membership. Neither AMEX nor Feins sought judicial review of the SEC decision.

In May 1994, Feins brought suit in New York State Supreme Court seeking monetary damages from AMEX. The action was removed by AMEX to the district court. Feins claimed that in denying her application, AMEX acted "negligently, carelessly, recklessly and wantonly," thereby breaching various duties that AMEX owed her under AMEX's constitution and rules and the Exchange Act. Feins's alleged damages included (1) the increase in market value of the membership from the time of AMEX's denial to the point when the SEC set aside that decision; (2) lost rental income from the lease of the membership during the same period; (3) fees incurred in connection with the membership application; (4) attorney's fees incurred challenging AMEX's decision; and (5) mental anguish and emotional suffering. Feins sought $1 million in compensatory damages and $9 million in punitive damages.

The district court construed Feins's complaint as asserting private rights of action under §§ 19(d), 19(f) and 19(g) of the Exchange Act, 15 U.S.C. §§ 78s(d), 78s(f) and 78s(g). The judge dismissed the complaint, determining that no private right of action can be found either expressed in the statutory language of §§ 19(d) and 19(f), or implied from Congressional intent in enacting §§ 19(d), 19(f) and 19(g). This appeal followed. After argument in this court, we invited the SEC to submit an amicus brief. It did so on April 1, 1996. The parties to the appeal thereafter filed briefs commenting on the SEC's brief.

## II.  Discussion

### A.  Regulation of Securities Exchanges Under the Exchange Act

Proper assessment of Feins's claims requires an understanding of the administrative authority the SEC has, under the Exchange Act, to oversee the actions and

decisions of a securities exchange such as AMEX. AMEX is registered as a national securities exchange pursuant to § 6, 15 U.S.C. § 78f, and is a "self-regulatory organization" as defined by § 3(a)(26), 15 U.S.C. § 78c(a)(26). The SEC is the "appropriate regulatory agency" for AMEX and any AMEX membership applicant pursuant to § 3(a)(34)(E), 15 U.S.C. § 78c(a)(34)(E).

The Exchange Act establishes a scheme of regulation of the securities marketplace that combines self-regulation by the securities exchanges with oversight and direct regulation by government agencies (in this case the SEC). S.Rep. No. 75, 94th Cong., 1st Sess. 23 ("Senate Report"), reprinted in 1975 U.S.C.C.A.N. 179, 201–02. A self-regulatory organization has a general obligation to comply with the Exchange Act and compel compliance by its members. Section 19(g)(1) provides, in pertinent part, that "[e]very self-regulatory organization shall comply with the provisions of this chapter, the rules and regulations thereunder, and its own rules, and ... enforce compliance ... with such provisions by its members and persons associated with its members...." 15 U.S.C. § 78s(g)(1).

Prior to comprehensive statutory amendments enacted in 1975 (the 1975 Amendments), the SEC had limited remedies available to it to enforce its regulatory and oversight authority over securities exchanges. Primarily, the SEC had the authority to suspend or withdraw the registration of a securities exchange or expel or suspend its members or officers, see former § 19, 15 U.S.C. § 78s (1970). One of the purposes of the 1975 Amendments, which included the provisions on which Feins relies, was to "significantly increase the regulatory options available to [the SEC] to deal with perceived self-regulatory shortcomings." Senate Report at 34, 1975 U.S.C.C.A.N. at 212. The 1975 Amendments augmented the SEC's "cumbersome ... oversight mechanism," *id.*, by empowering it to censure or impose limitations upon the activities, functions, and operations of a securities exchange, § 19(h), 15 U.S.C. § 78s(h), and by broadening the SEC's ability to seek mandamus or other injunctive relief in the district court to prevent violations of and compel compliance with the Exchange Act, §§ 21(d) and 21(e), 15 U.S.C. §§ 78u(d) and 78u(e). Furthermore, the rules of a securities exchange were made, in general, subject to review and prior approval by the SEC. Section 19(b), 15 U.S.C. § 78s(b).

In certain areas, the self-regulatory responsibilities of the securities exchanges were clarified. Pertinent to this case are the general obligation to admit to membership applicants that meet the statutory requirements, §§ 6(b)(2) and 6(c)(1), 15 U.S.C. §§ 78f(b)(2) and 78f(c)(1); the power to deny membership to any applicant subject to a statutory disqualification, § 6(c)(2), 15 U.S.C. § 78f(c)(2) [1]; and the power to deny membership based on the securities exchange's own rules, § 6(c)(3) (authorizing self-regulatory organizations to develop requirements for financial responsibility, operational capacity, training, experience, and ethical dealing), 15 U.S.C. § 78f(c)(3).

The amended Exchange Act requires that the exercise of these self-regulatory powers conform to the standards of due process. Senate Report at 25, 1975 U.S.C.C.A.N. at 203. Therefore, a securities exchange must comply with certain procedural requirements in connection with a denial of membership. See § 6(b)(7) (fair procedure generally), 15 U.S.C. § 78f(b)(7); § 6(d)(2) (notice and opportunity to be heard, specific grounds for denial, record of proceedings, and a determination supported by reasons), 15 U.S.C. § 78f(d)(2).

A securities exchange must notify the SEC of any denial of a membership application. Section 19(d)(1), 15 U.S.C. § 78s(d)(1). Section 19(d)(2) provides, in pertinent part, that the denial of an application for membership "shall be subject to review by the appropriate regulatory agency for such ... applicant, ... on its own motion, or upon application by

---

**1.** Statutory disqualifications include primarily prior felony convictions, willful violations of the federal securities laws, and other conduct that has, or could have, resulted in expulsion or suspension from a self-regulatory organization. Section 3(a)(39), 15 U.S.C. § 78c(a)(39).

any person aggrieved thereby...." 15 U.S.C. § 78s(d)(2). Section 19(f) provides, in pertinent part, that

> [i]n any proceeding to review the denial of membership ... in a self-regulatory organization to any applicant, ... if the appropriate regulatory agency for such applicant ..., after notice and opportunity for hearing ... finds that the specific grounds on which such denial ... is based exist in fact, that such denial ... is in accordance with the rules of the self-regulatory organization, and that such rules are, and were applied in a manner, consistent with the purposes of this chapter, such appropriate regulatory agency, by order, shall dismiss the proceeding. If such appropriate regulatory agency does not make any such finding, ... such appropriate regulatory agency, by order, shall set aside the action of the self-regulatory organization and require it to admit such applicant to membership.... 15 U.S.C. § 78s(f).[2]

Any final order issued by the SEC is reviewable by a court of appeals. Section 25(a)(1), 15 U.S.C. § 78y(a)(1).

### B. Private Rights of Action Under § 19

As noted above, Feins did not seek review of the SEC's decision not to award her any relief beyond admission to AMEX. Instead, she brought her action for damages. Feins asserts that the district court erred in holding that she did not have a private right of action, based either (1) on the explicit language of §§ 19(d) and 19(f) or (2) arising implicitly under §§ 19(d), 19(f) and 19(g), resulting from AMEX's improper denial of her application for membership.

### 1. Applicable Criteria

Before addressing Feins's claims, it will be helpful to examine the state of the law regarding the criteria to be applied in determining whether a federal statute authorizes a private cause of action. Federal courts are not always free to find a private right of action in favor of a person who has been

harmed as a result of a violation of a federal statute. See *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). Feins points to a number of older Supreme Court cases, including *Texas & Pacific Ry. v. Rigsby,* 241 U.S. 33, 36 S.Ct. 482, 60 L.Ed. 874 (1916) and *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), where the Court authorized the recovery by a private party of damages resulting from a violation of federal law. Almost all of the cases cited by Feins, however, use a different approach from that required by the Supreme Court today in determining whether a statute implies a private right of action. With regard to *Borak,* for example, the Court noted in *Touche Ross,* 442 U.S. at 578, 99 S.Ct. at 2490 that "[t]o the extent our analysis in today's decision differs from that of the Court in *Borak,* it suffices to say that in a series of cases since *Borak* we have adhered to a stricter standard for the implication of private causes of action." Moreover, in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), also relied upon by Feins, the Court stated that "the question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive." *Id.* at 69, 112 S.Ct. at 1034 (quoting *Davis v. Passman,* 442 U.S. 228, 239, 99 S.Ct. 2264, 2273, 60 L.Ed.2d 846 (1979)). Indeed, *Franklin* is a precise example of this distinction. That case held that monetary damages was an available remedy under Title IX of the Education Amendments of 1972. But it was crucial to the Court's decision that in *Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), it had already recognized an implied right of action. 503 U.S. at 65–66, 112 S.Ct. at 1032–33.

In *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), and in subsequent cases, the Court has been engaged in a continuous process of identifying the relevant factors to determine if a private cause of action is implicit in a statute not expressly

---

**2.** Identical or substantially similar provisions apply to the imposition of disciplinary sanctions, prohibitions or limitations with respect to access to services offered by a self-regulatory organization, and barring a person from being associated with a member. See §§ 19(d), 19(e) and 19(f), 15 U.S.C. §§ 78s(d), 78s(e) and 78s(f).

providing one. For a thorough discussion of the development of private rights of action by the Supreme Court, see Richard A. Brisban, Jr., The Politics of Private Rights of Action, 11 Whittier L.Rev. 111, 119–27 (1989). In *Cort v. Ash,* the Court listed four relevant factors: Whether the plaintiff is one of the class for whose especial benefit the statute was enacted; whether there is an indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one; whether implying such a remedy is consistent with the underlying purposes of the legislative scheme; and whether the cause of action is one traditionally relegated to state law. 422 U.S. at 78, 95 S.Ct. at 2087. However, the Court subsequently pointed out in *Touche Ross,* 442 U.S. at 575, 99 S.Ct. at 2488, that it did not decide in *Cort v. Ash* that "each of these [four] factors is entitled to equal weight." The Court stressed that "the central inquiry" remains Congressional intent. *Id.* Two years later, the Court said that the "[f]actors relevant" to determining the intent of Congress when a statute "does not expressly provide for a particular private right of action" are "the language of the statute itself, its legislative history, the underlying purpose and structure of the statutory scheme, and the likelihood that Congress intended to supersede or to supplement existing state remedies." *Northwest Airlines, Inc. v. Transport Workers Union of America,* 451 U.S. 77, 91, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981). A year later, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 377, 102 S.Ct. 1825, 1838, 72 L.Ed.2d 182 (1982), the Court observed that "[o]ur cases subsequent to *Cort v. Ash* have plainly stated that our focus must be on the intent of Congress" (internal quotation omitted). It further noted, *id.* at 378, 102 S.Ct. at 1839, that the circumstances surrounding the passage of the statute, i.e., Congress' perception of the law that it was shaping or reshaping, was also relevant.

A review of these cases suggests that it is frequently not easy to divine Congressional intent in this situation. In *Spicer v. Chicago Board of Options Exchange, Inc.,* 977 F.2d 255, 258 (7th Cir.1992), Judge Flaum for the Seventh Circuit described the process as an "inexact science," and we agree with that characterization. Nevertheless, we are called upon to do the best we can. We are consoled by the thought that if our construction of the statute is flawed, not only will the normal channel of judicial review apply, but also Congress can always correct our error.[3] We turn now to consider each of Feins's claims.

2. Express Rights of Action Under §§ 19(d) and 19(f)

Sections 19(d) and 19(f) expressly provide for a system of administrative review of membership denials and a remedy for erroneous decisions. Each denial must be communicated to the SEC. Any person aggrieved by a membership denial can invoke SEC review of that decision. The statute spells out the standard of review to be employed, and leaves no discretion to the SEC with respect to the appropriate remedy. The SEC must either dismiss the proceeding or set aside the denial and order admission.

Feins does not, and can not, point to any specific language in §§ 19(d) and 19(f) that confers upon her a private right of action in the district court. There is none. This is in contrast to a number of other provisions of the Exchange Act where the language of the statute explicitly confers a private right of action. See §§ 9(e), 16(b) and 18(a), 15 U.S.C. §§ 78i(e), 78p(b) and 78r(a). Feins argues that we should interpret §§ 19(d) and 19(f) to provide a private remedy for the wrongful denial of a membership application because the statute expressly sets forth AMEX's obligations, but does not expressly provide adequate relief for AMEX's failure to meet them. In support of this assertion, Feins relies on the Supreme Court cases

---

**3.** Cf. in this connection the recommendation of the Long Range Plan for the Federal Courts, recently approved by the United States Judicial Conference, that when reviewing proposed legislation, Congress should require legislative committees to complete a legislative "checklist," including whether a private right of action is contemplated. Judicial Conference of the United States, Long Range Plan for the Federal Courts 125–26 (Dec.1995) (Implementation Strategy 91b).

referred to above, such as *Rigsby* and *Borak*, where the Court authorized recovery of damages due to a violation of federal law. But, as already indicated, these cases deal with implied causes of action, rather than those expressly provided for and, in any event, they do not represent the governing law. In short, the claim that §§ 19(d) and 19(f) expressly authorize Feins's action is without merit.

3. Implied Rights of Action Under §§ 19(d), 19(f) and 19(g)

a. Sections 19(d) and 19(f)

As noted above, §§ 19(d) and 19(f) expressly provide for a system of administrative review of membership denials and a remedy for erroneous decisions. In a number of cases, the Supreme Court has refused to find an implied cause of action in a statute that expressly provides for its enforcement either by an administrative tribunal or in the district court in a suit brought by an executive or administrative agency.

Thus, in *Karahalios v. National Federation of Federal Employees,* 489 U.S. 527, 532, 109 S.Ct. 1282, 1286, 103 L.Ed.2d 539 (1989) the Court held that no private cause of action exists to enforce the duty of fair representation by a federal employees union where an administrative remedy by the Federal Labor Relations Authority for breach of that duty is expressly provided for. Similarly, in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 20, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979) ("*TAMA*") the Court ruled that there is no private cause of action for damages (other than restitution) in connection with a contract that violates, and is therefore void under, the Investment Advisers Act of 1940 where the SEC can impose administrative sanctions and bring actions in the district court to enjoin violations of the statute. In *Securities Investor Protection Corp. v. Barbour,* 421 U.S. 412, 420, 425, 95 S.Ct. 1733, 1738, 44 L.Ed.2d 263 (1975), the Court held that a customer of a failing broker-dealer does not have a private right of action under the Securities Investor Protection Act of 1970 to compel the Securities Investor Protection Corp. to exercise its statutory authority for the customer's benefit

where that agency has substantial administrative supervision over the activities in question. And, in *National Railroad Passenger Corp. v. National Association of Railroad Passengers,* 414 U.S. 453, 457, 464–65, 94 S.Ct. 690, 692, 696–97, 38 L.Ed.2d 646 (1974) ("*Amtrak*"), the Court ruled that section 307(a) of the Rail Passenger Service Act of 1970 does not create a private cause of action because the statute limits enforcement power primarily to district court actions instituted by the Attorney General.

In these cases, the Supreme Court repeatedly stressed that absent specific legislative intent to the contrary, "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *TAMA,* 444 U.S. at 19, 100 S.Ct. at 246. See also *Amtrak,* 414 U.S. at 458, 94 S.Ct. at 693. The Court has also noted the significance (as negating the existence of a private cause of action) of a Congressional decision to let a private person harmed by the violation of a federal statute "activate and participate in the administrative process contemplated by the statute." *Cannon,* 441 U.S. at 707, n. 41, 99 S.Ct. at 1963, n. 41.

The overall structure of the statute provides additional evidence that Congress did not intend to provide a private cause of action in federal court. The Exchange Act sets out a comprehensive regulatory scheme for the securities industry. Government agencies work together with the self-regulatory organizations to insure compliance with the statute, the rules promulgated thereunder, and the self-regulatory organization's own rules. The SEC has a number of enforcement and compliance tools at its disposal. "The presumption that a remedy was deliberately omitted from a statute is strongest when Congress has enacted a comprehensive legislative scheme including an integrated system of procedures for enforcement." *Northwest Airlines,* 451 U.S. at 97, 101 S.Ct. at 1583–84.

Thus, in *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court determined that there was no

implied cause of action under § 409 of the Employee Retirement Income Security Act of 1974 (ERISA) for the beneficiary of a plan to recover extra-contractual compensatory and punitive damages from a plan fiduciary where benefits were temporarily interrupted but eventually paid in full. The Court noted:

> The six carefully integrated civil enforcement provisions found in § 502(a) of [ERISA] ... provide strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly. The assumption of inadvertent omission is rendered especially suspect upon close consideration of ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a comprehensive and reticulated statute.

*Id.* at 146, 105 S.Ct. at 3092 (emphasis in original) (internal quotation omitted).

The legislative history of the 1975 Amendments indicates that their purpose was to make the hybrid scheme of self-regulation and government regulation work better to "ensure that there is no gap between self-regulatory performance and regulatory need...." Senate Report at 2, 1975 U.S.C.C.A.N. at 181. The method chosen to do this was to clarify the obligations of the securities exchanges, increase the authority of the SEC over the actions and rules of securities exchanges, and increase the SEC's enforcement capability. These changes, and the reasoning behind them, do not suggest Congressional intent to use private parties to enforce the statute through private causes of action. Rather, to effectuate its purpose, Congress sought to rely on the expanded oversight and enforcement powers of administrative agencies such as the SEC. See Senate Report at 23, 1975 U.S.C.C.A.N. at 201–02 (The 1975 Amendments were designed to ensure that "[SEC] oversight powers are ample and its responsibility to correct self-regulatory lapses is unmistakable.").

We have considered the factors that the Supreme Court has determined as relevant to Congressional intent—particularly the language of the statute, its underlying purpose and structure, its legislative history, and Congress' perception of the law at the time of the 1975 Amendments and what changes they wished to make—and they all point to an intent not to provide a private cause of action under §§ 19(d) and 19(f).

Feins concedes that the 1975 Amendments substantially increased the oversight and enforcement ability of the SEC, but argues that a private cause of action under these circumstances is consistent with this legislative intent. Moreover, Feins argues, such an action is necessary, or at least helpful, to protect membership applicants against quasi-governmental abuse by erroneous decisions of a securities exchange.

We think that the procedure and the remedy that Congress expressly provided accomplishes the goal of the statute. The 1975 Amendments were designed to correct erroneous membership decisions of securities exchanges, whether made intentionally, negligently or otherwise. A private cause of action for compensatory and punitive damages is not necessary and would add negligibly to the ability of the SEC to enforce the standards that securities exchanges must apply in order to deny an application for membership.

The statute requires that membership be granted to those who meet the criteria of the statute and the rules of the securities exchange. If an exchange fails to do so, the SEC must order it done. If Feins had still been seeking membership to AMEX at the time of the SEC decision and if her grandson had not already sold the membership to her son, this relief would have been adequate. Feins has not claimed that AMEX cannot implement their offer to admit her to membership or comply with any SEC order to do so, as might be the case if AMEX could not find or require a third party to sell a membership to Feins. Her claim instead is that by the time she won her appeal before the SEC, the price of a membership had increased substantially, so that she would have had to purchase the membership at a much higher price than originally bargained for.

There is nothing in the statute or its legislative history to suggest that Congress intended to recompense the out-of-pocket expenses or consequential damages of those

who have suffered erroneous denial of membership. Cf. *Touche Ross*, 442 U.S. at 570–71, 99 S.Ct. at 2486–87 (the purpose of § 17(a) of the Exchange Act was to forestall the insolvency of broker-dealers, not to compensate those damaged by such an insolvency). Feins would have us interpret this omission to imply that Congress would not object to private suits for such damages in the district court. But, the fact that applicants improperly denied membership may suffer monetary damages means only that the statute could provide more protection had Congress intended it. "[Federal courts] 'will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide.'" *Thompson v. Thompson*, 484 U.S. 174, 187, 108 S.Ct. 513, 520, 98 L.Ed.2d 512 (1988) (quoting *California v. Sierra Club*, 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981)).

Feins cites *Cannon v. University of Chicago* as an example of a private cause of action that was necessary to effectuate congressional purpose because existing administrative remedies were inadequate. In *Cannon*, one of the reasons supporting an implied cause of action under Title IX of the Education Amendments of 1972 was that the available administrative remedy (the cut-off of federal funds) was too drastic to be effective in bringing about the statutory purpose of preventing gender discrimination. 441 U.S. at 704–08, 99 S.Ct. at 1961–64. However, in this case the 1975 Amendments recognized the ineffectiveness of the existing administrative remedies by providing additional enforcement powers and remedies that were closely tailored to reverse erroneous membership denials and other self-regulatory abuses.

Feins argues vigorously that she is entitled to sue here because §§ 19(d) and 19(f) are designed to protect a particular class of persons—those who meet the necessary qualifications of membership in a self-regulatory organization—and that she is a member of that class. Even if we make the questionable

assumption that Feins still desires membership in AMEX and therefore fits the class of persons protected by the statute, this factor, without more, does not override the congressional intent indicated by the language of the statute, its purpose, its structure and its legislative history. See *TAMA*, 444 U.S. at 24, 100 S.Ct. at 249 ("[T]he mere fact that the statute was designed to protect advisers' clients [against fraudulent practices by investment advisers] does not require the implication of a private cause of action on their behalf [where Congress did not intend to create one].").

Finally, Feins emphasizes that the statute does contemplate an enforcement role for individuals whose membership has been denied. This is true, and to that extent the statute does give Feins a cause of action. Indeed, as we read the statute Feins might well have appealed to a federal court of appeals the SEC's refusal to require AMEX to admit her to membership under the terms of the original transaction.[4] Section 25(a)(1), 15 U.S.C. § 78y(a)(1). But her right to seek relief from the SEC is not the same as the private right of action she now asserts.[5]

b. Section 19(g)

Feins also argues that she has an implied private right of action for monetary damages under § 19(g) of the Exchange Act. That section, in general terms, states that a securities exchange must comply with the Exchange Act and its own rules.

Feins cites no case in which a court has found an implied private right of action under § 19(g). Feins does cite *Brawer v. Options Clearing Corp.*, 807 F.2d 297 (2d Cir. 1986), cert. denied, 484 U.S. 819, 108 S.Ct. 76, 98 L.Ed.2d 39 (1987). That case, however, dealt not with § 19(g), but with § 6 of the Exchange Act after the 1975 Amendments, and noted the questionable vitality of this court's decision 42 years earlier in *Baird v. Franklin*, 141 F.2d 238 (2d Cir.), cert. denied, 323 U.S. 737, 65 S.Ct. 38, 89 L.Ed. 591

---

**4.** We do not suggest that the SEC's ruling that it lacked power to award Feins this relief was incorrect.

**5.** Nothing in this opinion should be construed to deny Feins an appropriate cause of action under state law, and we express no view on the merits or timeliness of any such claim.

(1944) which also involved § 6. *Brawer*, 807 F.2d at 302. We held in *Baird* that under certain circumstances an injured investor could maintain a private right of action under the former § 6 against a securities exchange for its failure to enforce compliance by a member with the exchange's rules. *Baird*, 141 F.2d at 245 (Clark, J., dissenting). In *Brawer*, this court directly questioned, given the enactment of the 1975 Amendments and the change in Supreme Court analysis discussed earlier in this opinion, the continued existence of such a private cause of action under amended § 6. See 807 F.2d at 299 & n. 2. In *Brawer*, we also questioned whether the doctrine of *Baird* could be "extended after the 1975 Amendments to support a private cause of action [under § 6] for an [exchange's] failure to comply with its own rules." *Id.*

We see no persuasive reason to explore further the continued vitality of *Baird* today, since Feins's suit is *not* based upon § 6 but upon the general obligations language of § 19(g). A claim that the latter section creates a cause of action for Feins based upon AMEX's denial of membership seems particularly unpersuasive since we have already determined that there is no implied cause of action under §§ 19(d) and 19(f), the sections that specifically deal with an exchange's compliance with its own membership rules.[6]

### Conclusion

We have considered all of Feins's arguments with respect to a private cause of action for monetary damages resulting from the denial of her application for membership in AMEX, and we find them to be without merit. The judgment of the district court is affirmed.

---

**6.** The SEC, in its amicus brief, agrees that there is no need to reach the issue of the existence of a private right of action under § 19(g) because §§ 19(d) and 19(f) provide a mechanism for direct SEC review of membership application denials.